<u>TO THE FULLEST EXTENT PERMITTED BY LAW, THIS AGREEMENT IS SUBJECT TO ARBITRATION PURSUANT TO THE FEDERAL ARBITRATION ACT AND, IF THE FEDERAL ARBITRATION ACT IS INAPPLICABLE, THE MARYLAND UNIFORM ARBITRATION ACT.</u>

DEALERSHIP AGREEMENT
(BOATS)

Between

JEANNEAU AMERICA, INC.

And

**Chesapeake Yacht Center Inc.**
1014 Cromwell Bridge Road Baltimore
Maryland 21286 USA
(as the DEALER)

Dated as of 1 September, 2013



CYC 002937

TABLE OF CONTENTS

RECITALS

DEFINITIONS

ARTICLE I          Status of the DEALER

ARTICLE II         DEALER's general obligations

ARTICLE III        Transfer and use of personal details

ARTICLE IV         Terms of sale of the Boats by JEANNEAU

ARTICLE V          Terms of sale of Spare parts by JEANNEAU

ARTICLE VI         Quotas

ARTICLE VII        End-of-Year discounts

ARTICLE VIII       Terms of payment for the Boats

ARTICLE IX         Acceptance of the Boats

ARTICLE X          Conditions in relation to the resale of Boats by the DEALER

ARTICLE XI         Conditions in relation to the resale of Spare Parts by DEALER

ARTICLE XII        After-sales service and repairs

ARTICLE XIII       Assistance against unfair competition and infringement of industrial property rights

ARTICLE XIV        Boat Shows and Reserved customers

ARTICLE XV         Trade or company secrets

ARTICLE XVI        Term of the Agreement

ARTICLE XVII       *Intuitu personae*

ARTICLE XVIII      Obligations of the parties upon termination

ARTICLE XIX        Obligations of the DEALER during the notice period

i

CYC 002938

ARTICLE XX        Termination as of right

ARTICLE XXI       Previous agreements and reciprocal general terms and conditions of sale and
                  purchase

ARTICLE XXII      No waiver

ARTICLE XXIII     *Force majeure*

ARTICLE XXIV      Language of the Contract

ARTICLE XXV       Applicable Law

ARTICLE XXVI      Arbitration

ARTICLE XXVII     Compliance with Law; Anti-Bribery Compliance

ARTICLE XXVIII    Entire Agreement

ARTICLE XXIX      Non-assignability by DEALER

ARTICLE XXX       Severability

ARTICLE XXXI      Exhibits

ARTICLE XXXII     Counterparts

ARTICLE XXXIII    State Specific Provisions

List of Appendices

- Appendix 1: List of Boats

- Appendix 2: Zone of Principal Responsibility

- Appendix 3: Secondary Network

- Appendix 4:

        4-1: Annual promotional plan

        4-2 : Boats exhibited

 - Appendix 5: Terms and conditions in relation to the transfer and use of personal data
outside the European Union

ii

CYC 002939

- Appendix 6: Warranty Terms and Conditions of the Boats

- Appendix 7: Net tariff and Deposits

- Appendix 8: General terms and conditions for the sale of Spare Parts

- Appendix 9: End-of-Year Discounts

-Appendix 10: Key Personnel

-Appendix 11: Relevant Policies

-Appendix 12: State Specific Provisions

-Appendix 13: Sale of Competitor Goods

-Appendix 14: Language of the Contract

iii

CYC 002940

## DEALERSHIP AGREEMENT

THIS DEALERSHIP AGREEMENT (this "Agreement") is made as of 1 September, 2012, by and between JEANNEAU AMERICA, INC., a DELAWARE corporation ("JEANNEAU"), with offices at 105 Eastern Avenue, Annapolis, Maryland 21403 USA, and Chesapeake Yacht Center, a Maryland corporation ("DEALER"), with offices at 1014 Cromwell Bridge Road Baltimore MD 21286USA

### RECITALS:

1.    The parent and certain affiliate companies of JEANNEAU (collectively, the "Groupe Beneteau Affiliates") build boats, particularly for leisure boating, under the Jeanneau brand name. JEANNEAU is an authorized distributor and importer in the United States of boats and related equipment and accessories manufactured by Groupe Beneteau Affiliates and sold under the Jeanneau and other brand names. JEANNEAU markets, sells and distributes boats built by Groupe Beneteau Affiliates and related equipment and accessories for sale in the Americas.

2.    This Agreement provides for services by the DEALER which are an important part of JEANNEAU's distribution of boats built by the Groupe Beneteau Affiliates, as more particularly described on Appendix 1 hereto, subject to the terms hereof.

3.    The DEALER has represented to JEANNEAU that the DEALER (i) has substantial experience in the distribution of, and after sale services for, boats and related equipment and accessories, (ii) has, or has access to, the technical and commercial skills necessary to ensure efficient distribution and proper transfer of the Products (as defined herein), (iii) has use of an office, showroom or display space, and service facility sufficient to perform the foregoing services, and (iv) has all necessary means to meet its obligations and other requirements set forth herein.

4.    JEANNEAU desires and expects, and the DEALER agrees, that the DEALER will distribute JEANNEAU Products and ensure active and efficient promotion, sales and service of the Products within the DEALER's Zone of Principal Responsibility (as defined herein), as more particularly set forth on Appendix 2 hereto, all subject to and upon the terms and conditions set forth below.

NOW, THEREFORE, in consideration of the premises and mutual terms and conditions herein contained, the parties agree as follows:

### DEFINITIONS:

In addition to the other terms defined herein, to clarify the understanding and interpretation of certain terms used in this Agreement, and whether in the singular or plural form, the parties hereby adopt the following reference definitions:

1.    "Annual Amendment" means an amendment to this Agreement signed by the parties at the start of each Contractual Period beginning with the second Contractual Period, formalizing

CYC 002941

the commitments and/or provisions subject to annual review. Each new amendment shall replace the previous amendment.

2.    "Boats" mean new boats manufactured by the Groupe Beneteau Affiliates, the models of which are listed in <u>Appendix 1</u> hereto (as amended from time to time), and all their related equipment and gear thereon and accessories added thereto, subject to the terms set forth in this Agreement.

(a)    The aforementioned list in <u>Appendix 1</u> shall be updated and amended at the start of each Contractual Period and shall be attached to the Annual Amendment.

(b)    JEANNEAU reserves the right, at any time, without any prior warning, to include any new model in such lists simply by giving Notice.

(c)    JEANNEAU may also exclude any model from such lists at any time by giving Notice.

(d)    JEANNEAU reserves the right to make any modifications or changes to any one or more of the various models in order to make them more user-friendly or aesthetically pleasing, to improve production costs, or for any other reason whatsoever. Any such changes may be made from time to time and in JEANNEAU's sole discretion.

3.    "Contractual Period" means the period extending from the date on which this Agreement is signed until the following August 31 inclusive, and each subsequent period of twelve consecutive calendar months.

4.    "Limited Warranty" means the limited warranty provided by JEANNEAU, the scope, terms and presentation of which are stated in <u>Appendix 6</u> hereto, as the sole warranty for its Boats and other Products.

5.    "Notice" means written notice sent by FedEx or other nationally recognized overnight courier, U.S. registered or certified mail with acknowledged receipt or, if necessitated by urgency or for convenience, a fax or an e-mail, provided receipt of such fax or electronic delivery is acknowledged by the addressee. Notice by such means is the only valid means of notice hereunder, unless both parties otherwise agree in writing.

6.    "Products" mean all the Boats and Spare Parts, as those terms are defined herein.

7.    "Quotas" mean the DEALER's minimum purchase obligation for the Boats for the applicable Contractual Period, as more fully set forth in <u>Article VI</u> hereof.

8.    "Secondary Network" means all the sub-dealers or commercial agents of the DEALER, a list of which is included in <u>Appendix 3</u> hereto.

9.    "Spare Parts" mean the spare parts manufactured or authorized by the Groupe Beneteau Affiliates for use in connection with the Boats.

2

CYC 002942

10. "Systematic Prospecting" means any activity, individually or in concert with other activities, intended or likely to generate sales to prospects or customers located outside the DEALER's Zone of Principal Responsibility, including using communication methods to promote Products in a place of sale, establishing a distribution network, setting up a branch, depot or showroom, sending representatives to visit prospects or customers, sending flyers or unsolicited email (spam) to prospects or customers located outside the DEALER's Zone of Principal Responsibility, and offering Products on one or more websites, using internet advertising, and using search engine optimization techniques to actively approach or solicit prospects or customers located outside the DEALER's Zone of Principal Responsibility. The foregoing list is by way of example and is not exhaustive.

Without limiting the generality of the foregoing, the following shall not be considered as Systematic Prospecting: (a) the promotion or offer of Products by the DEALER on its website, unless such promotion or offer, through the methods it employs, targets particular prospects or customers and/or one or more territories located outside the DEALER's Zone of Principal Responsibility; (b) the participation of the DEALER, at the invitation of JEANNEAU, at an exhibit sponsored by JEANNEAU in any nautical tradeshow, with the objective of selling Boats from such exhibit; and (c) the publication or broadcast of advertisements on national media in the country in which the DEALER's Zone of Principal Responsibility is located.

11. "Trademarks" mean any trademark, service mark or logo owned or registered by JEANNEAU or any Groupe Beneteau Affiliate for any one or more of the Products.

12. "Zone of Principal Responsibility" means the Zone of Principal Responsibility as defined in <u>Appendix 2</u> of this Agreement, subject to the terms and conditions set forth in <u>Article XIV</u>.

## ARTICLE I: STATUS OF THE DEALER

1. The DEALER shall operate as an independent contractor. The DEALER shall purchase, market and sell the Products under the terms of this Agreement, and perform its duties under this Agreement, acting under its own name and on its own account and shall be free to establish the resale price of the Products at its own convenience. The relationship of the parties is not, and shall not create, a joint venture, partnership, principal-agent, broker, sales representative, franchise or business opportunity. The relationship of the parties hereunder shall be that of commercial seller and purchaser of commercial goods. The DEALER shall not be considered an employee, franchisee, representative, partner or agent of JEANNEAU for any purpose.

2. The DEALER shall not, and shall not have any right, power or authority to, assume, accept, create or incur any liability, responsibility or obligation of any kind, express or implied, against, in the name of, on behalf of or for the account of JEANNEAU in any sort of transaction with any third party whatsoever. In addition, the DEALER shall not make any representation, warranty, guarantee, statement, promise or commitment whatsoever relating to the Product, except as may be expressly authorized by JEANNEAU by Notice to the DEALER.

3. Subject to the terms and conditions of this Agreement, and subject to the exceptions set forth in <u>Article XIV</u> of this Agreement with respect to customers or potential customers reserved

3

CYC 002943

for JEANNEAU and the Groupe Beneteau Affiliates and except for trade/boat shows within DEALER's Zone of Principal Responsibility, JEANNEAU hereby appoints the DEALER as its exclusive DEALER for the Products within the Zone of Principal Responsibility, with the right to systematically prospect for sales of Products within the Zone of Principal Responsibility.

4.     The undersigned DEALER acknowledges that neither JEANNEAU, nor any Groupe Beneteau Affiliate, nor any employee, agent, officer, director or other individual or entity acting for or in behalf of JEANNEAU or any Groupe Beneteau Affiliate, or any of its subsidiaries or affiliates, has imposed on or requested from the DEALER any form of required payment, either directly or indirectly, other than for the purchase, at bona fide wholesale prices, of a reasonable quantity of goods to be used for resale.

5.     The relationship between JEANNEAU and the DEALER is that of seller and buyer for the purposes of soliciting orders for the sale of tangible personal property within and subject to the protections provided by federal Public Law (P. L.) 86-272. As such, the relationship of the parties shall not cause or create any tax nexus with a state for JEANNEAU as an out-of-state seller, and the DEALER shall not cause JEANNEAU to incur or become liable for any such tax.

## ARTICLE II: DEALER'S GENERAL OBLIGATIONS

1.     PROMOTION.

(a)     The DEALER shall have the technical and commercial skills necessary to ensure efficient distribution and service of the Products. In particular, within its designated Zone of Principal Responsibility, the DEALER shall have and maintain, or cause to be maintained, during each Contractual Period hereof the appropriate commercial installations and qualified personnel necessary to promote, display and sell the Products to customers. In addition, the DEALER shall possess and maintain information technology equipment enabling effective electronic communication and data transfer with JEANNEAU.

(b)     The DEALER shall supply JEANNEAU, upon JEANNEAU's request, with copies of all advertising and/or promotional materials used by the DEALER to promote the Products prior to their use. JEANNEAU reserves the right to require the DEALER to discontinue immediately using any material should JEANNEAU, in its sole discretion, determine that such material is inconsistent with the quality standards associated with the Trademark.

(c)     The DEALER shall use its best efforts to promote the sale of the Products and to distribute the Products in the Zone of Principal Responsibility and shall make every effort to increase sales of the Products in the Zone of Principal Responsibility during each Contractual Period. It shall ensure, both in quantity and in quality, that its financial, marketing, promotional and advertising representations, presentations and materials are in line with its obligations as an exclusive dealer in the Zone of Principal Responsibility that has been exclusively assigned to it.

4

CHARLESTON 33960 v9

CYC 002944

Further, the DEALER shall also use its best efforts to advertise and actively and effectively promote the Products in accordance with the promotions plan agreed between the parties at the start of each Contractual Period, formalized in Appendix 4 for the first Contractual Period, and then, for each subsequent Contractual Period, by the Annual Amendment relating thereto.

(d)    In any advertising, promotion or presentation of the Products by the DEALER to any customers, the DEALER shall not make any statement that is derogatory of JEANNEAU or the Products or that is contrary to the content of the technical documentation supplied, distributed or otherwise approved by JEANNEAU. The DEALER shall not disparage, malign or contradict JEANNEAU, the Products or the Trademarks in any manner whatsoever.

(e)    Notwithstanding anything to the contrary contained in this Agreement, the DEALER shall not be required to pay, and it will not pay, any marketing, advertising or promotional fees or charges to JEANNEAU that would constitute a franchise fee under the laws of any applicable jurisdiction governing the terms and performance of this Agreement.

2.    TRADEMARK.

(a)    Subject to Article XIV of this Agreement, during the Term of this Agreement JEANNEAU grants to the DEALER the non-exclusive right and license to use the Trademark "Jeanneau" in the Zone of Principal Responsibility in conjunction with the distribution, sale, promotion, and advertising of the Products in the Zone of Principal Responsibility, subject to certain approvals, guidelines, and quality standards as set forth in Article II of this Agreement. The license herein granted shall be limited to the DEALER's right to use the Trademark "Jeanneau" in the Zone of Principal Responsibility in connection with, and only with, such approved activities relating to the Products.

(b)    JEANNEAU expressly reserves the right to use the Trademarks (i) in the Zone of Principal Responsibility in connection with the promotion and advertising of the Products, and (ii) in connection with the sale, distribution, promotion, and advertising of goods other than the Products. The license herein granted shall be strictly coterminous with this Agreement and incidental hereto.

(c)    The DEALER shall use the Trademarks for the promotion and sale of the Products and respect JEANNEAU's operational marketing system and graphic charter in effect, which can be obtained from JEANNEAU and accessed on the latter's website.

(d)    The DEALER shall only sell the Products under the Trademark, which must appear clearly on the Products and all associated materials.

(e)    The DEALER may obtain from JEANNEAU, or from any third party appointed by JEANNEAU, and append, at its expense, the JEANNEAU Trademarks and emblems on all vehicles and on all shop windows, showrooms and exhibition stands used for the marketing of the Products. The DEALER shall not be required to pay JEANNEAU or any

5

CYC 002946

Groupe Beneteau Affiliate for any such materials, either directly or indirectly, in excess of $499 per year or such other amount to the extent payment of any such amount would constitute a franchise fee under applicable law.

(f)    The DEALER shall not insert or use the Trademarks in its company name, trade name, e-mail address or domain name.

(g)    The DEALER shall never allow the use of the Trademarks by third parties or file a similar or identical sign to the Trademarks as a trademark, service mark or logo.

3.    COMPLIANCE.

(a)    JEANNEAU shall be responsible for ensuring the compliance of the Boats with the applicable federal laws and regulations promulgated by the U.S. Coast Guard for Boats delivered in the United States (and Transport Canada for any Boats delivered in Canada) at the time of delivery to the DEALER.

(b)    The DEALER shall ensure the compliance of the Products with the requirements of all applicable laws and regulations affecting the manufacture, sale, packaging, distribution and labeling of Products which are in force in any state or local jurisdiction in its Zone of Principal Responsibility or any part thereof ("Local Regulations"), including without limitation, Local Regulations in relation to health and safety, fair trading and consumer protection.

(c)    The DEALER shall be solely responsible for bringing the Products into conformity with the aforementioned Local Regulations.

(d)    JEANNEAU shall not be responsible for the compliance of the Products with Local Regulations or liable for ensuring compliance of the Products with Local Regulations or for the consequences of a failure to comply therewith.

4.    EXHIBITION OF THE PRODUCTS.

(a)    The DEALER shall present, display and show the Products as clearly as possible, in optimum conditions, in all shop windows, showrooms, exhibits, stands and other locations intended for customer visits, whether permanent or otherwise.

(b)    The DEALER shall provide and maintain an office and showroom or display area, whether on site or off site, and including temporary exhibits and permanent facilities, for the purpose of performing its duties hereunder and to clearly and optimally display the Products in the most apparent, professional and favorable manner at all times.

(c)    The DEALER shall maintain exclusive control over the design of its showroom and display areas; provided, however, the DEALER acknowledges and agrees that its showroom or display area will be maintained consistent with the acknowledged high

6

CYC 002946

professional image of JEANNEAU and the Groupe Beneteau Affiliates and the goodwill associated with the Trademarks.

5.    EXHIBITION BOATS.

(a)    The DEALER shall permanently have, or have on order, new Boats for immediate presentation to customers, the quantity and models of which shall be negotiated with JEANNEAU at the start of each Contractual Period. For the first Contractual Period, the negotiated quantity and models are stipulated in Appendix 4 hereto, and then for each subsequent Contractual Period, the quantity and models shall be stipulated in the Annual Amendment relating thereto.

(b)    Within the meaning of this article, "new Boats" shall refer to any Boat supplied to the DEALER during a Contractual Period.

6.    SYSTEMATIC PROSPECTING.

The DEALER shall not carry out any Systematic Prospecting outside its Zone of Principal Responsibility.

7.    USE OF A WEBSITE.

(a)    The DEALER shall operate and maintain a website to promote the Products and Trademarks. The website operated directly by the DEALER or in its name by another company shall respect the image of the Jeanneau brand and Trademarks and of the Products and shall comply with the Jeanneau graphic charter in force.

(b)    The website shall be written in the official language(s) of the Zone of Principal Responsibility.

8.    SALE OF COMPETITOR GOODS.

The DEALER shall not sell, or arrange for the sale of, either directly or indirectly, any goods in competition with the Products, unless approved in writing by JEANNEAU.

9.    TRAINING OF THE DEALER'S PERSONNEL.

Every year, JEANNEAU shall inform the DEALER of the training courses organized or set up for the purpose of helping the DEALER and its personnel acquire knowledge of the Products and intended to ensure the optimum satisfaction of customers and users of the Products. The DEALER shall make every effort to arrange for its personnel to participate in such courses. The DEALER shall not be required to pay JEANNEAU for its participation and the participation of its personnel in such training courses (the DEALER shall, however, be responsible for its own accommodations, transportation and meals, etc.), to the extent the payment of such costs would constitute a franchise fee under the applicable law. To enable JEANNEAU to organize such

7

CYC 002947

training courses as well as possible, the DEALER shall promptly inform JEANNEAU of any change to its personnel.

10.    AVAILABILITY OF RESOURCES.

(a)    The DEALER shall have and maintain, or cause to be maintained, at all times, within its Zone of Principal Responsibility, either directly or through its agents or third-party contractors, suitable facilities, including technical installation and repair facilities, qualified, skilled personnel and the appropriate tools and equipment to enable it to effectively and quickly perform (i) any technical operations in relation to the transfer, routing, launching, preparation and delivery of the Products (including onto and from the water), (ii) repairs claimed under a Product warranty, (iii) the after-sales service in general, and (iv) all related customer support operations.

(b)    If necessary, the DEALER shall appoint service providers to perform the transfer onto and from the water and customer support activities.

(c)    JEANNEAU may, upon reasonable notice and during normal business hours, perform inspections to confirm the quality of the DEALER's technical operations and facilities, personnel, equipment and tools.

11.    SECONDARY NETWORK.

(a)    Upon prior written approval by JEANNEAU, the DEALER may enter into sub-dealer agreements or commercial agency agreements with third parties for the distribution of the Products and/or the provision of repair and maintenance services for the Products.

(b)    The DEALER shall provide reasonable prior Notice to JEANNEAU of any plans to enter into or terminate a sub-dealer agreement or commercial agency agreement including all relevant information (including without limitation, the name of the company concerned, any assigned area, location of the premises, etc.). JEANNEAU may in its reasonable discretion reject such intended action, in which case the DEALER will not proceed with such action.

(c)    The DEALER shall be and remain solely responsible to JEANNEAU for orders placed by it and members of its Secondary Network. Where a Boat is received by a member of the Secondary Network, the DEALER shall provide prior Notice to such member of all required acceptance operations for the Boat, and ensure that such member performs same in accordance with the provisions of Article IX hereof.

(d)    The DEALER shall ensure compliance by its sub-dealers and/or commercial agents with the provisions of Articles II (except for sections 1, 3, 4, 5, 11, 15 and 17), III, IX, XII, XIII, XIV, XV, XVI, XVII, XVIII, XX, and XXIII of this Agreement.

(e)    The DEALER shall ensure that each member of its Secondary Network uses its best efforts in the performance of the services provided on behalf of the DEALER and

8

JEANNEAU, including without limitation, professionalism and Product knowledge, and effective and appropriate promotion, marketing, sales and/or service of the Products in the Zone of Principal Responsibility.

(f)    The DEALER shall ensure that the members of its Secondary Network do not, in promoting, marketing, selling or servicing the Products, make any statement that is derogatory about, and/or contrary to the content of technical documentation distributed by, JEANNEAU.

(g)    Where a member of the Secondary Network takes part in a trade show on a Jeanneau exhibit, the costs relating to such participation shall be billed to and paid or collected by the DEALER, unless the payment of such costs would constitute a franchise fee under applicable law.

(h)    The DEALER shall ensure that the members of the Secondary Network, wherever possible, clearly present the Products, in optimum conditions, in all shop windows, showrooms, exhibits and other locations intended for customer visits, whether permanent or otherwise.

(i)    The DEALER shall ensure that the members of the Secondary Network have and maintain the appropriate commercial installations, sufficient quantities and models of new Boats, and qualified personnel, necessary to effectively promote, display and sell and/or service the Products to customers.

12.    SUB-CONTRACTING.

(a)    Prior to its use of sub-contractors to perform routing, launching, preparation and delivery of the Products and/or after-sales service, the DEALER shall ensure that each such sub-contractor (i) possesses the necessary reliability, availability, qualifications and skills, and (ii) has acquired and maintained the appropriate technical skills, knowledge and certifications.

(b)    JEANNEAU shall have the right, upon reasonable notice during normal business hours, to inspect the technical operations of and the work performed by such sub-contractors, and shall be accompanied, as necessary in JEANNEAU's sole discretion, by the DEALER.

(c)    The DEALER shall ensure that each sub-contractor obtains and maintains adequate and appropriate insurance policies consistent with the requirements of Article IV.7(d), and the DEALER shall remain responsible for any lapse or failure by sub-contractor to do so.

(d)    The DEALER shall ensure the satisfactory performance of the services it entrusts to sub-contractors. In the event of the failure or inability of any sub-contractor to perform such services, the DEALER shall do whatever is required and take all necessary actions in order for the services to be provided efficiently and promptly.

(e)    The DEALER shall retain full responsibility for the sub-contracted services.

CHARLESTON 3396610v9

CYC 002949

13.    PARTICIPATION IN MEETINGS ORGANIZED BY JEANNEAU AND RESERVED
FOR THE MEMBERS OF ITS DEALER NETWORK.

(a)    The DEALER shall make every effort to participate in and shall have all appropriate
members of its personnel attend and participate in conventions, meetings, seminars,
webinars, courses and other events organized, approved, attended or conducted by
JEANNEAU. Such events and meetings may include, without limitation, any of the
following: (i) the annual DEALER meeting; (ii) an annual service seminar; (iii) an annual
sales training seminar; (iv) seminars for certification in product knowledge; (v) events to
present PRESTIGE's marketing plans; and (vi) events to present Product information.

(b)    The DEALER shall also ensure that all appropriate and necessary personnel are certified
to JEANNEAU standards, if requested to do so by JEANNEAU.

14.    TRANSMISSION OF INFORMATION.

(a)    The DEALER shall provide JEANNEAU with complete and accurate financial
statements, including its income and balance sheets, prepared by a certified public
accountant, in form and substance satisfactory to JEANNEAU, and certified by the
appropriate financial officer of the DEALER, within six months of the end of the related
fiscal year, and such other pertinent financial information as may be reasonably requested
by JEANNEAU from time to time.

(b)    The DEALER shall send JEANNEAU twice per annum, once at the start of each
Contractual Period and once by the following March 31, its interim financial statements in
the form of tables showing: (i) the amount of its cash; (ii) the amount and structure of its
debt; (iii) the amount of its outstanding debt in relation to the Products; and (iv) the value
of its stock of second-hand boats.

(c)    The DEALER shall send JEANNEAU an inventory of its stock of new Boats every
month.

15.    INFORMATION SYSTEM.

(a)    The DEALER acknowledges that a material portion of the functions necessary or
convenient to the performance of its obligations under this Agreement, including the
ordering of Products, customer registration, scheduling and participation in training
events, scheduling of services and warranty information, and the transmission of other
important information are conducted electronically, via web-based management systems.
The DEALER agrees that it shall acquire and maintain at all times such software and
information systems as are both (i) compatible with JEANNEAU's software and systems
and (ii) necessary or appropriate to properly perform its obligations under this Agreement.
The DEALER shall maintain its access to, and keep current on, the JEANNEAU
electronic system and shall comply with the security standards of such system.

10

CYC 002860

(b)     JEANNEAU shall provide Notice to the DEALER of any change to its software or information systems no less than three (3) months prior to the use of such change by JEANNEAU.

16.     CUSTOMER SATISFACTION FEEDBACK.

The DEALER shall promptly respond to any request for and actively participate in the performance and consideration of surveys and other activities undertaken by or at the direction of JEANNEAU to assess customer satisfaction.

17.     TAKING DELIVERY OF THE BOATS.

(a)     The DEALER shall take delivery of each Boat, sold F.O.B. at one of the Groupe Beneteau Affilitiates, during a five calendar day period following Notice of Availability (as defined herein) ("Receipt Period") at the point of delivery designated by JEANNEAU in the Notice of Availability ("Point of Delivery"). The DEALER shall take delivery of each Boat, sold P.O.E., immediately upon arrival at the port of entry.

(b)     Upon the lapse of the Receipt Period, JEANNEAU may in its sole discretion invoice the DEALER for storage costs, at the rate of 1.0% of the total invoiced amount per month of delay, plus any other additional third party charges incurred by JEANNEAU because of a delay by the DEALER to take delivery as required by the terms of this Agreement. JEANNEAU may amend this rate upon Notice to the DEALER.

(c)     JEANNEAU also reserves the right in its sole discretion, if the DEALER fails to remove one or more Boats from the Point of Delivery within seven calendar days after expiration of the Receipt Period, to cancel the related order in whole or in part, without prejudice to any other claims, including without limitation claims for damages, JEANNEAU may have as a result of such cancellation, and without liability to DEALER. The DEALER shall indemnify and hold harmless JEANNEAU for customer and other third party claims resulting therefrom.

**ARTICLE III: TRANSFER AND USE OF PERSONAL DATA**

1.     The DEALER shall send JEANNEAU the personal data (surname, first name, postal address, email address, etc.) of its customers and prospective customers of the Products or other goods of JEANNEAU or any Groupe Beneteau Affiliate, as set forth on Appendix 5.

2.     JEANNEAU shall send to the DEALER the personal data of registered owners and prospective customers that have expressly informed it of their intention or interest to purchase a Boat in the DEALER's Zone of Principal Responsibility.

3.     To the extent applicable to the DEALER's business or any of its activities pursuant to this Agreement, the DEALER shall comply, and shall ensure compliance by its employees, agents and third-party contractors, with the Gramm-Leach-Bliley Act, the Federal Trade Commission Privacy Rules (and in Canada, the Personal Information Protection and Electronic Documents

11

CYC 002951

Act, SC 2000, c. 5, Personal Information Protection Act, SBC 2003, c 63, and An Act respecting the Protection of personal information in the private sector, RSQ, c P-39.1), and any other codes, statutes, rules, regulations, ordinances and permits relating to or arising from personal financial and other data of customers or prospective customers or the privacy or other protection thereof.

4.      This Article is in addition and complementary to, and is not intended to limit or alter, the provisions of <u>Article XXVII</u> hereof.

## ARTICLE IV: TERMS OF SALE OF THE BOATS BY JEANNEAU

1.      JEANNEAU agrees to provide the DEALER with Boats to the extent of their availability, subject to the terms and conditions of this Agreement.

2.      During the Term of this Agreement, the DEALER may publicize within its Zone of Principal Responsibility that it is a JEANNEAU authorized dealer. The DEALER may also publish on its business stationery, signs, website, flyers and advertisements, the words "Jeanneau Dealer," provided in all circumstances DEALER shall maintain strict compliance with the characters, Trademarks, logos and colors of Jeanneau's graphic charter in all of its communications.

3.      The DEALER shall provide each purchaser of a Boat with a printed copy of the Jeanneau Limited Warranty, the scope, terms and presentation of which are stated in <u>Appendix 6</u> hereto.

As between the DEALER and JEANNEAU, JEANNEAU HEREBY DISCLAIMS THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE, AND THE IMPLIED CONDITIONS OF MERCHANTABLE QUALITY AND FITNESS FOR A PARTICULAR PURPOSE. JEANNEAU further disclaims all other liabilities of whatever nature to the extent allowed by applicable law, and neither JEANNEAU nor Groupe Beneteau assumes, nor authorizes any person, including, but not limited to, the DEALER, to assume for it, any other obligation or liability in connection with the sale and use of the Products. JEANNEAU and Groupe Beneteau shall in no event, to the extent permitted by applicable law, be liable to the DEALER, the owner or any other person or entity for damages of any kind, including but not limited to direct, indirect, special, incidental or consequential damages (as to all consequential damages except those arising from personal injury), arising from the sale or in connection with the use or inability to use the Product for any purpose whatsoever, irrespective of whether the claims or actions for such damages are based upon contract, tort, negligence, strict liability, warranty, or other legal theories of liability.

4.      The Products are sold by JEANNEAU Cash on Delivery, F.O.B. factory Marion, South Carolina for Boats manufactured in Marion, South Carolina, or F.O.B. port of entry, duty paid, Norfolk, Virginia, for all imported Boats, unless otherwise designated by JEANNEAU to the DEALER for each sale. JEANNEAU shall provide Notice to the DEALER or its authorized agent that the Products are available for acceptance by the DEALER at the Point of Delivery ("Notice of Availability"). Subject to paragraph 7 below, the Products shall be deemed to have been accepted by the DEALER and delivery to the DEALER shall be deemed to have been completed at such Point of Delivery on the earlier to occur of: (i) execution and delivery by the

12

CYC 002862

DEALER's authorized agent of a delivery acceptance certificate of form acceptable to JEANNEAU, and (ii) upon the expiration of the Receipt Period. The insurance obligation and risks are transferred to the DEALER in accordance with the stipulations of such delivery terms, notwithstanding the reservation of ownership clause stated in paragraph 7 below. The Products shall travel at the risk and at the peril of the DEALER. The costs of transportation and insurance of the Products after F.O.B. Marion, South Carolina, or Port of Entry, Norfolk, Virginia, as the case may be, shall be borne by the DEALER.

5.      JEANNEAU will promptly consider each purchase order received from the DEALER. JEANNEAU shall use commercially reasonable efforts to deliver all Products in a timely manner; however, all delivery dates are estimates only and do not commit or bind JEANNEAU to deliver any Product on a specific date.

(a)    JEANNEAU shall not be liable for any delays in executing the orders, as delivery times are given as estimated times only. Damages may not be claimed by the DEALER for JEANNEAU's failure to deliver the Products, whether on any estimated delivery date or within any estimated delivery period, if the Products become available, or otherwise.

(b)    JEANNEAU may in its sole discretion accept or reject each order as received, or to reduce the quantities of any particular model or type of Boat ordered by DEALER. The decision of JEANNEAU as to the allocation of Products among JEANNEAU's dealers, and others shall be final and binding upon DEALER, who shall have no claim of any kind against JEANNEAU for its failure to fill orders previously received or accepted by JEANNEAU.

6.      The prices to be paid by the DISTRIBUTOR to JEANNEAU for the Boats are as set forth in Appendix 7 of this Agreement, as same may be amended by JEANNEAU in its sole discretion from time to time; provided, however, JEANNEAU shall give the DEALER thirty (30) days Notice prior to placing into effect any such price change ("Pricing Protection Term"). Price changes shall not apply to any order for thirty (30) days following issuance by JEANNEAU of a Notice of Availability, provided that the DEALER takes delivery of applicable Boats in compliance with the provisions of paragraph 4 above.

7.      Pursuant to the terms and conditions of this Agreement, the DEALER expressly agrees that all Products sold to it by JEANNEAU shall remain the property of JEANNEAU until payment in full is received by JEANNEAU in accordance with the sale order terms and conditions and this Agreement.

(a)    The foregoing reservation of ownership clause shall not modify the time of the transfer of risk or responsibility to the DEALER, as stated in paragraph 4 of this Article IV.

(b)    In the event the DEALER fails to pay all or any portion of the JEANNEAU invoice by the due date, for any reason whatsoever, JEANNEAU may immediately demand, in its sole discretion and without further notice of any kind, the return of the Products from the DEALER, at the DEALER's sole cost and risk, and the DEALER shall promptly comply with such demand. In such circumstance, the DEALER shall also forfeit, and JEANNEAU shall be entitled to retain as damages, the deposit provided pursuant to the terms of Article

13

CHARLESTON 339603v9

VIII below.  JEANNEAU reserves the right to seek additional damages as it deems necessary in its sole discretion.  In addition, and without limiting the foregoing, JEANNEAU may also immediately terminate this Agreement.

(c)    The DEALER agrees to take all measures to protect the Products and shall use its best efforts to care for and secure all Products.  The DEALER shall provide JEANNEAU free access to the premises used to store the goods.  The DEALER shall also refrain from transforming, incorporating or pledging the goods sold until it has paid JEANNEAU the full invoiced amount, unless it has obtained prior and express written permission from JEANNEAU in each instance.

(d)    The DEALER shall obtain and maintain in full force and effect for the duration of this Agreement, all appropriate insurance policies acceptable to JEANNEAU covering risks of total or partial destruction, damage or loss from fire, wind, storm, flood, theft, mysterious disappearance, misuse and extended perils including vandalism, malicious mischief and sprinkler leakage, to the Products on DEALER's premises or under DEALER's possession or control, and general liability, which insurance policy or policies shall be in an amount not less than the full replacement value of the Products.  The DEALER shall include JEANNEAU as an additional insured and loss payee on such policy and deliver to JEANNEAU a certificate thereof.  The policy shall provide that it shall not be cancelled or modified without giving JEANNEAU a minimum of thirty (30) days prior written notice thereof.

(e)    Any other agreement entered into by JEANNEAU and the DEALER in relation to the reservation of ownership of any Product shall not render the provisions of this paragraph 7 void; provided, that in the event of a conflict between the terms of such other agreement and this paragraph 7, such terms of the other agreement shall control, but only to the extent of the inconsistency.

## ARTICLE V:  TERMS OF SALE OF SPARE PARTS BY JEANNEAU

JEANNEAU shall sell Spare Parts to the DEALER in accordance with the conditions stipulated in the General Terms and Conditions of Sale, as set forth in Appendix 8 hereto.  The DEALER shall purchase or otherwise obtain Spare Parts only from JEANNEAU approved sources.

## ARTICLE VI:  QUOTAS

1.    In order for this Agreement to remain in force, the DEALER shall, during each Contractual Period, purchase Boats for which total payments satisfy the Quota established by JEANNEAU, which shall equal sixty percent (60%) of the Negotiated Objective for such Contractual Period. JEANNEAU shall have the right to terminate this Agreement with immediate effect, if the Dealer fails to satisfy the Quota.

2.    The objective negotiated for the first Contractual Period is set forth in Appendix 9 hereto. The Quota for subsequent Contractual Periods shall be as set forth in the corresponding Annual Amendment.

14

CYC 002954

CYC 002955

3.     If the DEALER fails to achieve any Quota, this Agreement may be terminated as a matter of right by JEANNEAU pursuant to <u>Article XX</u> below.

## ARTICLE VII: END-OF-YEAR DISCOUNTS

1.     The DEALER may be entitled to year-end discounts, the conditions and rates of which are set forth in <u>Appendix 9</u> to this Agreement.

2.     Upon satisfaction by the DEALER of such conditions, an amount equal to such discounts shall be payable to the DEALER as set forth in <u>Appendix 9</u> to this Agreement.

## ARTICLE VIII: TERMS OF PAYMENT FOR THE BOATS

1.     As a condition precedent to order acceptance by JEANNEAU, the DEALER must pay by bank transfer to JEANNEAU a deposit in an amount specified by JEANNEAU. Such deposit is non-refundable, non-transferable and cannot be offset against another order. For the first Contractual Period the amount of the deposit required for each Boat is set forth in <u>Appendix 7</u> of this Agreement. The deposit amount, which may be changed by JEANNEAU in its sole discretion for each following Contractual Period, will be set forth in the corresponding Annual Amendment.

2.     Boats ordered by the DEALER will be invoiced as of the date of the Notice of Availability and will be payable in cash exclusively by bank transfer on or before the date the DEALER removes the Boat from the Point of Delivery, but in no event later than the expiration of the Receipt Period.

3.     Payments made before the Boat is removed from the Point of Delivery are not subject to discount. However, JEANNEAU reserves the right in its sole discretion to apply a discount during any Contractual Period in accordance with the terms and conditions then in effect.

By way of exception, in the event that a Boat is paid for by a funding body approved by JEANNEAU, JEANNEAU may include such payment by transfer if payment is made within a period of time acceptable to JANNEAU and the DEALER.

4.     Subject to limitations set forth in this Agreement, in the event that reciprocal debts have arisen between the parties during the performance of this Agreement, the parties agree that said debts may be paid by offsetting the lowest.

5.     JEANNEAU may in its sole discretion, but is not obligated to, agree to accept on a case-by-case basis methods of payment other than by bank transfer for one or more sales to the DEALER hereunder; provided, however, that such agreement will be effective only for the specific sale(s) to which it expressly relates and will not be deemed to constitute an amendment to this Agreement with respect to any other orders.

15

CYC 002956

6.      Any breach of this Agreement consisting, in particular, of a delay in the payment of an invoice, or an objection or a return, shall automatically make all outstanding sums, even if not due, without Notice or judicial formality and without prejudice to any damages, immediately due and payable in full, and interest shall accrue on such unpaid amount until paid in full at a rate per annum equal to the lesser of (i) eighteen percent (18%), and (ii) to the extent a maximum interest rate is imposed by law on commercial contracts, such maximum rate of interest as permitted by law.

7.      Notwithstanding the foregoing paragraphs, JEANNEAU reserves the right to refuse delivery except for cash by bank transfer, including payment for Products previously delivered, and to stop delivery in the event the DEALER fails to pay any amount due under this Agreement on the date on which such amount is first due.

8.      JEANNEAU shall have the right to terminate this Agreement with immediate effect as provided in Article XX below if the DEALER fails to pay any amount due under this Agreement or otherwise breaches this Article VIII.

## ARTICLE IX: ACCEPTANCE OF THE BOATS

1.      Immediately upon delivery of a Product at the Point of Delivery, the DEALER or its shipping agent shall inspect such Product to confirm that such Product complies with the shipping, purchase and other contractual documents, and promptly upon delivery of such Product to the DEALER's premises, the DEALER shall inspect such Product to confirm that such Product fully complies with the shipping, purchase and other contractual documents associated therewith and shall promptly Notify JEANNEAU, not to exceed seven calendar days of delivery of such Product at the Point of Delivery (the "Inspection Period"), if the Product fails to comply with any such documentation requirements.

2.      Within the Inspection Period, the DEALER agrees to perform, or have performed by personnel possessing necessary technical skills, any inspections and technical tests necessary or appropriate to find, detect, reveal or discover any possible non-compliance of the Products with their technical specifications.

3.      If no substantiated complaint is made by Notice of the DEALER to JEANNEAU containing details of any defects or non-conformities within the Inspection Period, the DEALER shall be forever barred from invoking a claim for non-compliance, non-conformity, defect or shortage, whether latent or of any other character that could have been reasonably expected to be detected by personnel possessing the necessary technical skills to inspect the Product on Delivery.

## ARTICLE X: CONDITIONS IN RELATION TO THE RESALE OF THE BOATS BY THE DEALER

1.      The DEALER shall notify each purchaser of the Limited Warranty. The DEALER shall prominently display the Limited Warranty in the DEALER's premises and shall attach the Limited Warranty to all orders signed by its customers. In addition, the DEALER shall amend the order forms it uses in dealing with its customers prior to the sale of any Product so that (i)

16

CYC 002957

reference is expressly made therein to the Limited Warranty and to the incorporation by reference of said Limited Warranty into the order, and (ii) the only disclaimers of any warranties, express or implied, and the only representations or warranties contained within the order form, as relates to JEANNEAU and its Products, shall be the disclaimers, representations, and/or warranties set forth in the Limited Warranty.

2.      Within seven calendar days of the delivery of the Product by the DEALER to a purchaser or user, the DEALER shall complete and electronically submit to JEANNEAU the online Limited Warranty form on the JEANNEAU company website. In the event that the DEALER fails to submit the warranty information to JEANNEAU as provided in this paragraph, the DEALER shall be deemed to be in breach of its obligations for purposes of Article XX of this Agreement.

3.      The Products sold by the DEALER shall be in substantially the same condition as when delivered by JEANNEAU, and the DEALER shall not alter, remove or otherwise tamper with, but shall maintain all of, the Trademarks, emblems, or the hull number affixed on the Products; provided, however, that the DEALER shall have the right to indicate its name and address and its capacity as supplier of the Boats and authorized DEALER of JEANNEAU on a label or plate, affixed on the Boats in a suitable manner.

## ARTICLE XI:  CONDITIONS IN RELATION TO THE RESALE OF SPARE PARTS BY THE DEALER

The DEALER shall inform each purchaser of Spare Parts of the existence, if any, and content of any limited warranty that may be provided by the original manufacturer of the Spare Part. The General Terms and Conditions of Sale of Spare Parts are set forth in Appendix 8 hereto.

## ARTICLE XII: AFTER-SALES SERVICE AND REPAIRS

1.      As stated in Article X above, within seven days of delivery of each Boat by the DEALER to the purchaser or user, the DEALER agrees to formally notify JEANNEAU of such delivery by completing and electronically submitting the warranty document available on the JEANNEAU company website. Such notification is for the purpose of establishing the start date of JEANNEAU's contractual Limited Warranty.

2.      The DEALER shall perform any repairs required under the Limited Warranty, as well as scheduled and requested maintenance of the Products. It shall also carry out any checks or operations requested by JEANNEAU in relation to preventive maintenance through a recall campaign or by providing technical information to customers.

3.      The DEALER acknowledges and understands that pursuant to the requirements of federal law, JEANNEAU may from time to time recall Products for correction. The DEALER shall promptly comply with JEANNEAU's instructions for modification or alteration of any Products in connection with any such recall, including without limitation, Products sold by the DEALER or by any other JEANNEAU dealer, DEALER, or other authorized Person, and shall not sell or deliver any Products covered by any such instructions until the required modifications or

17

CHARLESTON 3396034v9

CYC 002958

alterations shall have been properly accomplished. DEALER shall indemnify and hold harmless JEANNEAU from any liability, loss or expense, including reasonable attorneys' fees, which JEANNEAU may suffer by reason of the DEALER's failure to comply with the provisions hereof.

4.    The operations and services expressly recognized by JEANNEAU as being covered by the Limited Warranty shall include the cost of faulty parts and/or their repair, and the labor costs incurred in disassembly and reassembly, shall be paid by JEANNEAU at the hourly rate of repayment in effect under the Limited Warranty and shall be determined by JEANNEAU during the Limited Warranty period, except where JEANNEAU determines that the repair or maintenance work are the result of abnormal use of the Boat, or that the Limited Warranty is otherwise invalidated or not applicable.

(a)    Prior to performing covered services, the DEALER shall provide to JEANNEAU via JEANNEAU's website a detailed quote estimating the services and procedures to be performed. Subject to JEANNEAU's prior written approval of the quote, the DEALER shall be reimbursed for performance of the specified services and procedures.

(b)    Unless authorized by JEANNEAU as covered by the Limited Warranty, any travel by JEANNEAU's Technical Department resulting from a request for assistance by the DEALER shall be charged to the DEALER on the basis of the after-sales service rates in effect at JEANNEAU for each day that the technician commissioned is absent from JEANNEAU.

5.    During the term of the Limited Warranty, the DEALER agrees to perform such warranty repairs and after-sales service without charge to the customer, regardless of the point of sale or the type of Boat, except where the DEALER determines that the repairs or maintenance work are the result of abnormal use, or that the warranty is invalidated or otherwise not applicable.

6.    Following expiration of the Limited Warranty, the DEALER shall continue to provide effective repairs and after-sales service at reasonable rates in accordance with the DEALER's market area to any owner of a Boat, including boats manufactured by JEANNEAU in general, who may request it, without regard to the age of the Boat, the source of purchase or the place where the Boat is customarily based.  The DEALER agrees to provide service performance satisfactory to JEANNEAU.

## ARTICLE XIII:    ASSISTANCE AGAINST UNFAIR COMPETITION AND INFRINGEMENT OF INTELLECTUAL PROPERTY RIGHTS

1.    Each party shall promptly give Notice to the other party if it becomes aware of: (a) any infringement or suspected infringement of the other party's Trademarks, patents, or any other intellectual property rights; (b) any claim that any Product or the manufacture, use, sale, import or export, or other disposal of any Product within the DEALER's Zone of Principal Responsibility, is infringing upon the rights of, or is being infringed upon by, a third party; or (c) any act of unfair competition.

18

CHARLESTON 339603v9

CYC 002959

2.      In respect of any matter falling within this Article XIII, JEANNEAU and the DEALER shall agree what steps to take to prevent or terminate the infringement or unfair competition, and the proportions in which they shall share the cost of those steps and any damages or other sums which may be awarded to or against them. Failing agreement between JEANNEAU and the DEALER, either party may take any action as it considers necessary or appropriate in such party's reasonable discretion, at its own expense, to defend the claim and shall be entitled to and responsible for all damages and other sums that may be recovered or awarded against it as a result of such action.

## ARTICLE XIV:  BOAT SHOWS AND RESERVED CUSTOMERS

Notwithstanding the provisions of Article I.3 hereof, JEANNEAU expressly reserves the right to: (a) authorize any of its dealers to display, market, promote and sell any of the Products at any trade/boat show in DEALER's Zone of Principal Responsibility; and (b) sell and distribute any of the Products in the DEALER's Zone of Principal Responsibility to, by or through: (i) key personalities (professional navigators, entertainers, top athletes, etc.) to which it is connected for any brand promotion operations; (ii) group purchasers; (iii) staff members of companies belonging to the group to which it belongs; (iv) administrative or governmental bodies; (v) businesses which engage in the business of renting or chartering boats; and (vi) sailing and other training schools or "boat schools" and any franchisees or affiliates of any of the foregoing.  In any of the foregoing circumstances, the DEALER agrees that such activities, sales, promotion and distribution shall not constitute a breach by JEANNEAU of this Agreement.

## ARTICLE XV: TRADE OR COMPANY SECRETS

1.      The DEALER shall not at any time disclose to any Person any confidential information concerning the business, affairs, customers, clients or suppliers of JEANNEAU, except: (a) to those of its employees, officers, representatives or advisers who need to know that information for the purpose of carrying out the party's obligations under this Agreement, provided such employees, officers, representatives or advisers to whom it discloses confidential information agrees to comply with this Article XV; and (b) as may be required by law, court order or any governmental or regulatory authority, provided JEANNEAU is given Notice and an opportunity to object to such disclosure or request a protective order.

2.      Each party shall refrain from giving any third parties any documents or documentation concerning the other party, which were not specifically intended to be distributed to the public as set forth in this Agreement.

3.      The provisions of this Article XV shall apply at all times during the Term and shall survive after expiration or earlier termination of this Agreement, and without limiting the foregoing, the DEALER's obligations to protect Trade Secrets shall continue for so long as such information is deemed to be a Trade Secret under any applicable federal laws, or those of the state of Maryland, and the relevant provisions of this Article XV in respect of such protection, rights, and obligations shall survive termination or expiration of this Agreement.

19

CYC 002980

4.     Without limiting the foregoing, the DEALER agrees that it shall not disclose any confidential access codes to JEANNEAU's websites.

## ARTICLE XVI:  TERM OF THE AGREEMENT

1.     This Agreement shall become effective on the date it is executed by the last party to sign and is entered into for a term of three Contractual Periods, unless earlier terminated in accordance herewith (the "Term").

(a)     This Agreement may be terminated for convenience by either party by providing to the other party at least six (6) months' prior Notice.

(b)     In the absence of early termination pursuant to Article XVI.1(a), Article XX, or Article XXIII.3 hereof, this Agreement shall expire at the conclusion of the third Contractual Period (*i.e.*, on August 31, 2016).  JEANNEAU may provide Notice to the DEALER of forthcoming expiration within thirty (30) days after the beginning of the third Contractual Period; provided, however, failure by JEANNEAU to timely provide such Notice shall not constitute a breach of this Agreement and shall not extend the Term.

2.     Neither party shall be subject to liability or damages as a result of termination for convenience pursuant to Article XVI.1(a).

## ARTICLE XVII:  *INTUITU PERSONAE*

1.     The DEALER acknowledges that JEANNEAU has entered into this Agreement in consideration of the specific personnel to be provided by the DEALER to provide the services under this Agreement.  The DEALER shall ensure that the personnel ("Assigned Personnel"), including those Assigned Personnel identified as Key Persons, listed on Appendix 10 will, throughout the Term of this Agreement, be assigned to the team that will perform the services hereunder and that the Assigned Personnel actually perform the services and devote such time and attention to the performance of the services, as is set forth in this Agreement, or if not set forth, such time and attention as is satisfactory to JEANNEAU at all times in its discretion. Such personnel will not be removed from such team except with the prior written consent of JEANNEAU, or for circumstances beyond the control of the DEALER, such as illness, death, or such person terminating their employment with the DEALER; provided that the DEALER may during the Term of this Agreement replace one (1), but no more than one (1), of the Assigned Personnel, but not a Key Person, with a different person satisfactory to JEANNEAU in the event that such person being replaced is no longer employed by the DEALER or its affiliates. If the DEALER breaches this provision, JEANNEAU shall have the right to terminate this Agreement in the manner stipulated in Article XX below.

(a)     In the event of the death of a Key Person, as set forth on Appendix 10, or such Key Person's inability to manage, his/her successors, heirs or de facto managers at the DEALER shall promptly prepare and present to JEANNEAU, within ninety (90) days, a proposed restructuring plan or a plan to sell the DEALER.

20

CHARLESTON 339603v9

CYC 002861

(b)    The tacit or express agreement by JEANNEAU in relation to the temporary continuity of the DEALER by the successors, heirs or managers shall not be considered to be a waiver by JEANNEAU of its right to invoke the provisions of paragraph 1 of this Article, and in case (i) of the failure to submit the aforementioned plan within the timeframe specified by JEANNEAU or (ii) of the submission of a plan deemed to be inadequate by JEANNEAU, in its sole discretion, said provisions shall apply.

2.    This Agreement may only be assigned, or its obligations delegated, by the DEALER with the express, prior written agreement of JEANNEAU, in its sole discretion, given by way of a Notice.

3.    Any act and/or agreement resulting in a substantial change in the ownership or the control or the management of the DEALER shall constitute, and be considered by JEANNEAU to be, an assignment requiring its prior consent given by way of Notice.

## ARTICLE XVIII: OBLIGATIONS OF THE PARTIES UPON TERMINATION

1.    Upon termination or expiration of this Agreement, all rights of the DEALER hereunder shall terminate and automatically revert to JEANNEAU, and the DEALER shall immediately (a) cease to represent itself as JEANNEAU's DEALER and stop using the term "JEANNEAU DEALER" on its business stationery and in its relations with customers, (b) remove or have removed any sign or indication that mentions anywhere its capacity as a DEALER, (c) remove all JEANNEAU Trademarks or emblems from its website, vehicles, showrooms and exhibits, (d) discontinue all use of the Trademarks and the distribution, sale, promotion and advertising of the Products, and (e) return to JEANNEAU all advertising and promotional materials in respect of any of the Products then in its possession.

2.    Any order for Products, other than an order for a pre-sold Boat, which is current on the date of termination or expiration shall be cancelled and any cash deposit made by the DEALER with respect to such order shall be reimbursed by JEANNEAU within thirty (30) days following the date of termination or expiration, subject to offset for any amount owed by the DEALER to JEANNEAU.

3.    Upon termination, the DEALER shall immediately provide JEANNEAU with a list of all Products on hand on the date of termination or expiration. During the ninety (90) days following the receipt of such list, JEANNEAU shall have the option to purchase, F.O.B. DEALER's warehouse, at the DEALER's JEANNEAU invoiced cost, any and all of the Products on hand which had been paid for by the DEALER, less transportation cost, less any amount owed by the DEALER to JEANNEAU, and, less any amount necessary to restore the Boats to a merchantable condition.

4.    Any Products on hand on the date of termination or expiration and which has not been paid for by the DEALER shall be immediately delivered to JEANNEAU F.O.B. DEALER's warehouse or display area.

21

CHARLESTON 339603v9

CYC 002982

5.     Notwithstanding the provisions of paragraph 1 hereof, the DEALER shall be entitled to sell and dispose of, on a non-exclusive basis, the inventory of the Products on hand on the date of termination or expiration for which JEANNEAU did not exercise its option, provided that (i) the Products have been entirely paid for and (ii) such sales are in accordance with all the provisions hereof which provisions shall survive this Agreement for this specific purpose.

6.     JEANNEAU shall, at any time after termination or expiration of this Agreement, have the right to establish and maintain any kind of relationship with the ultimate purchaser of or any agent, DEALER, dealer, retailer, client, customer or other distribution outlet at any level of distribution or sale which have distributed or will distribute, sell, or handle Boats and other Products within or without the Zone of Principal Responsibility and any other ultimate purchaser of or agent, DEALER, dealer, retailer, client, customer, or other distribution outlet at any level of distribution or sale, irrespective of whether they have had any contact or been solicited by the DEALER during the Term of this Agreement.

7.     The exercise of any right of termination or expiration under Articles XVI or XX shall not affect any rights which have accrued prior to termination, including, without limitation, the right of JEANNEAU to any payments which have accrued but remain unpaid, and shall be without prejudice to any other legal or equitable remedies to which JEANNEAU may be entitled by reasons of such rights.

## ARTICLE XIX:   OBLIGATIONS OF THE DEALER DURING THE NOTICE PERIOD

During the Notice periods provided in Articles XVI and X of this Agreement, the DEALER shall have no further obligations under Articles II.9 and II.13 hereof.

## ARTICLE XX: TERMINATION AS OF RIGHT

1.     JEANNEAU may terminate this Agreement at any time if, within thirty days of JEANNEAU sending Notice informing the DEALER that it has breached Article II.2, II.5, II.6, II.8, VIII or XII hereto, the DEALER fails to fully cure such breach.

2.     In the event of breach of Article VI, X, XVII, or XXVII, or where otherwise expressly provided in this Agreement, JEANNEAU shall have the right to terminate this Agreement with immediate effect.

3.     JEANNEAU shall have no liability to the DEALER pursuant to this Article XX for exercising its rights of termination hereunder and the DEALER hereby waives to the fullest extent permitted at law all rights, claims and remedies against JEANNEAU arising from or in connection with such termination.

## ARTICLE XXI:   PREVIOUS AGREEMENTS AND RECIPROCAL GENERAL TERMS AND CONDITIONS OF SALE AND PURCHASE

22

CYC 002863

1.    Subject to Article XXI.2, below, and Article IV.7(c), above, this Agreement shall cancel, control and replace all verbal and written agreements between the parties prior to this Agreement, and the DEALER's terms and conditions of purchase.

2.    All sales of Products shall be subject to the provisions in this Agreement and to the general terms and conditions of sale in force. In the event of any contradiction on the terms of sale of Products between this Agreement and the general terms and conditions of sale, the provisions of this Agreement shall prevail and control.

## ARTICLE XXII: NO WAIVER

The failure of either party to insist on strict performance of any of the agreements, terms, covenants and conditions hereof shall not be deemed a waiver of any rights or remedies that such party may have for any subsequent breach, default or non-performance and either party's right to insist on strict performance of this Agreement shall not be affected by any previous waiver or course of dealing.

## ARTICLE XXIII: FORCE MAJEURE

1.    Provided that it has complied with the provisions of Article XXIII.2, a party shall not be in breach of this Agreement in respect of, or liable for, any failure, interruption, or delay in performance of its obligations under this Agreement arising from or attributable to acts, events, omissions or accidents beyond its reasonable control ("Force Majeure Event"), including, without limitation, any of the following: epidemics, fires, floods, unusually severe weather or other extraordinary natural disturbances, acts of God or of the public enemy, acts of the United States government or a foreign government in its sovereign capacity, any civil commotion, riot, insurrection or hostilities, whether or not declared war, conditions that affect the safety of said party's personnel and/or equipment, restrictions due to quarantines, blockades, embargoes, unavailability of materials, severe and unforeseeable market shortages, sabotage, accidents, labor disputes or shortages, plant shutdown or equipment failure, voluntary or involuntary compliances with any law, order, rule or regulation of governmental agency or authority; or inability to obtain material (including power and fuel), equipment or transportation; or delays in shipment or inability to ship due to normal production and shipment delays; or those resulting from or in connection with any other contingency, circumstances or event

2.    A party that is subject to a Force Majeure Event shall not be in breach of this Agreement provided that: (a) it promptly notifies the other party in writing of the nature and extent of the Force Majeure Event causing its failure or delay in performance; and (b) it has used commercially reasonable efforts to mitigate the effect of the Force Majeure Event to carry out its obligations under this Agreement in any way that is reasonably practicable and to resume the performance of its obligations as soon as reasonably possible.

3.    If the Force Majeure Event continues for a continuous period of more than six months, either party may terminate this Agreement without liability for such termination by giving fourteen (14) days' Notice to the other party.  On the expiry of such notice period, this

23

CYC 002964

Agreement shall terminate. This termination shall not affect the rights of the parties in respect of any breach of this Agreement occurring before termination.

## ARTICLE XXIV: LANGUAGE OF THE CONTRACT

This Agreement is in the English language only, which language shall be controlling in all respects, and all versions of this Agreement in any other language shall be for accommodation only and shall not be binding on the parties to this Agreement. All communications and notices made or given pursuant to this Agreement, and all documentation and support to be provided, unless otherwise noted, shall be in the English language.

## ARTICLE XXV:  APPLICABLE LAW

The parties agree that this contract is deemed made and is entered into in the state of Maryland. The interpretation, construction and enforceability of this Agreement shall be governed in all respects by the laws of the State of Maryland and of the United States of America, without regard to any choice of law principles. Any legal proceedings arising out of any of the transactions or obligations contemplated by this Agreement, to the extent determined not to be subject to arbitration as required by <u>Article XXVI</u> below, may be brought in the state courts of the State of Maryland or the United States District Court for the District of Maryland located in Anne Arundel County. The parties hereto irrevocably and unconditionally: (a) submit to the jurisdiction of such courts and agree to take any and all future action necessary to submit to such jurisdiction; (b) waive any objection which they may now or hereafter have to the venue of any suit, action or proceeding brought in such courts; (c) waive any and all personal rights under the law of any other state or nation to object to jurisdiction within Maryland for the purposes of any action, suit, proceeding or litigation to enforce such obligations; and (d) waive any claim that any such suit, action or proceeding brought in such court has been brought in an inconvenient forum.

## ARTICLE XXVI: ARBITRATION

To the fullest extent permitted by applicable law:

1.     The parties hereto agree, upon demand by any party, to submit to binding arbitration all claims, disputes and controversies between or among them (and their respective employees, officers, directors, attorneys, and other agents), whether in tort, contract or otherwise in any way arising out of or relating to this Agreement.

2.     Any arbitration proceeding will (i) proceed in Anne Arundel County, Maryland at a location in Anne Arundel County, Maryland selected by the American Arbitration Association ("AAA"); (ii) be governed by the Federal Arbitration Act (Title 9 of the United States Code), notwithstanding any conflicting choice of law provision in any of the documents between the parties, and if for any reason the Federal Arbitration Act is deemed inapplicable, be governed by the applicable Maryland Uniform Arbitration Act; (iii) be conducted in the English language; and (iv) be conducted by the AAA, or such other administrator as the parties shall mutually agree upon, in accordance with the AAA's commercial dispute resolution procedures, unless the claim or counterclaim is at least $1,000,000.00 exclusive of claimed interest, arbitration fees and costs

24

CYC 002985

in which case the arbitration shall be conducted in accordance with the AAA's optional procedures for large, complex commercial disputes (the commercial dispute resolution procedures or the optional procedures for large, complex commercial disputes to be referred to herein, as applicable, as the "Rules"). If there is any inconsistency between the terms hereof and the Rules, the terms and procedures set forth herein shall control. Any party who fails or refuses to submit to arbitration following a demand by any other party shall bear all costs and expenses incurred by such other party in compelling arbitration of any dispute.

3.    Any arbitration proceeding will be decided by a single arbitrator selected according to the Rules. The arbitrator will be a neutral attorney licensed in the State of Maryland or a neutral retired judge of the state or federal judiciary of Maryland, in either case with a minimum of ten years experience in the substantive law applicable to the subject matter of the dispute to be arbitrated. The arbitrator will determine whether or not an issue is arbitrable and will give effect to the statutes of limitation in determining any claim. In any arbitration proceeding the arbitrator will decide (by documents only or with a hearing at the arbitrator's discretion) any pre-hearing motions which are similar to motions to dismiss for failure to state a claim or motions for summary adjudication. The arbitrator shall resolve all disputes in accordance with the substantive law of Maryland and may grant any remedy or relief that a court of such state could order or grant within the scope hereof and such ancillary relief as is necessary to make effective any award. The arbitrator shall also have the power to award recovery of all costs and fees, to impose sanctions and to take such other action as the arbitrator deems necessary to the same extent a judge could pursuant to the Federal Rules of Civil Procedure, the Maryland Rules of Civil Procedure or other applicable law. Judgment upon the award rendered by the arbitrator may be entered in any court having jurisdiction. The institution and maintenance of an action for judicial relief or pursuit of a provisional or ancillary remedy shall not constitute a waiver of the right of any party, including the plaintiff, to submit the controversy or claim to arbitration if any other party contests such action for judicial relief.

4.    In any arbitration proceeding, discovery will be permitted in accordance with the Rules. All discovery shall be expressly limited to matters directly relevant to the dispute being arbitrated and must be completed no later than 20 days before the hearing date. Any requests for an extension of the discovery periods, or any discovery disputes, will be subject to final determination by the arbitrator upon a showing that the request for discovery is essential for the party's presentation and that no alternative means for obtaining information is available.

5.    No party hereto shall be entitled to join or consolidate disputes by or against others in any arbitration, except parties who have executed this Agreement, or to include in any arbitration any dispute as a representative or member of a class, or to act in any arbitration in the interest of the general public or in a private attorney general capacity.

6.    The arbitrator shall award all costs and expenses of the arbitration proceeding.

7.    To the maximum extent practicable, the AAA, the arbitrator and the parties shall take all action required to conclude any arbitration proceeding within 180 days of the filing of the dispute with the AAA. No arbitrator or other party to an arbitration proceeding may disclose the existence, content or results thereof, except for disclosures of information by a party required in

25

CYC 002966

the ordinary course of its business or by applicable law or regulation. If more than one agreement for arbitration by or between the parties potentially applies to a dispute, the arbitration provision most directly related to this Agreement or the subject matter of the dispute shall control. This arbitration provision shall survive termination, amendment or expiration of the Agreement or any relationship between the parties.

8.     **WAIVER OF JURY TRIAL.     WITHOUT INTENDING IN ANY WAY TO LIMIT THE PARTIES' AGREEMENT TO ARBITRATE ANY DISPUTE AS SET FORTH HEREIN, TO THE EXTENT ANY DISPUTE IS NOT SUBMITTED TO ARBITRATION OR IS DEEMED BY THE ARBITRATOR OR BY ANY COURT WITH JURISDICTION TO BE NOT ARBITRABLE OR NOT REQUIRED TO BE ARBITRATED, THE PARTIES WAIVE TRIAL BY JURY IN RESPECT OF ANY SUCH DISPUTE AND ANY ACTION ON SUCH DISPUTE. THIS WAIVER IS KNOWINGLY, WILLINGLY AND VOLUNTARILY MADE BY THE PARTIES, AND THE PARTIES HEREBY REPRESENT THAT NO REPRESENTATIONS OF FACT OR OPINION HAVE BEEN MADE BY ANY PERSON OR ENTITY TO INDUCE THIS WAIVER OF TRIAL BY JURY OR TO IN ANY WAY MODIFY OR NULLIFY ITS EFFECT. THIS PROVISION IS A MATERIAL INDUCEMENT FOR THE PARTIES ENTERING INTO THIS AGREEMENT. THE PARTIES ARE EACH HEREBY AUTHORIZED TO FILE A COPY OF THIS SECTION IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER OF JURY TRIAL. DEALER FURTHER REPRESENTS AND WARRANTS THAT IT HAS BEEN REPRESENTED IN THE SIGNING OF THIS AGREEMENT AND IN THE MAKING OF THIS WAIVER BY INDEPENDENT LEGAL COUNSEL, OR HAS HAD THE OPPORTUNITY TO BE REPRESENTED BY INDEPENDENT LEGAL COUNSEL SELECTED OF ITS OWN FREE WILL, AND THAT IT HAS HAD THE OPPORTUNITY TO DISCUSS THIS WAIVER WITH COUNSEL.**

## ARTICLE XXVII: COMPLIANCE WITH LAW; ANTI-BRIBERY COMPLIANCE

1.     The DEALER shall perform all of its duties and obligations under the Agreement in full compliance with all laws of the United States and any other jurisdiction whose laws apply to this Agreement, and all codes, statutes, rules, regulations, ordinances and permits which may be applicable to its performance under this Agreement, including, without limitation, those pertaining to environmental protection, health, safety, pollution control, sanitary facilities, waste disposal, consumer privacy, consumer protection and public access to facilities. The DEALER shall indemnify, defend and hold JEANNEAU harmless from any and all liability, damage, cost, fine, penalty, fee and expense arising from the DEALER's failure to fully comply with this <u>Article XXVII</u>.

2.     Without limiting the generality of paragraph 1 of this Article, the DEALER shall also comply with all applicable codes, statutes, rules, regulations, ordinances and permits relating to anti-bribery and anti-corruption, including without limitation, the Foreign Corrupt Practice Act of 1977, 15 U.S.C. § 78dd-1, et seq. (and in Canada, Corruption of Foreign Public Officials Act, S.C. 1998, c. 34), as such laws may be amended from time to time ("Relevant Requirements").

26

CYC 002967

3.     The DEALER shall comply with JEANNEAU's Ethics, Anti-bribery and Anti-corruption Policies (annexed to this Agreement as <u>Appendix 11</u>), as JEANNEAU may update same from time to time ("Relevant Policies").

4.     The DEALER shall:

(a)     have and maintain in place throughout the Term of this Agreement its own policies and procedures to ensure compliance with the Relevant Requirements and the Relevant Policies, and will enforce them where appropriate;

(b)     promptly report to JEANNEAU any request or demand for any undue or financial or other advantage of any kind received by the DEALER in connection with the performance of this Agreement;

(c)     promptly report to JEANNEAU if a foreign public official becomes an officer or employee of the DEALER or acquires a direct or indirect interest in the DEALER and the DEALER warrants that it has no foreign officials as officers, employees or direct or indirect owners at the date of this Agreement;

(d)     within sixty (60) days of the date of this Agreement, and annually thereafter, certify to JEANNEAU in writing signed by an officer of the DEALER, compliance with this <u>Article XXVII</u> by the DEALER and all Associated Persons (as defined below).  The DEALER shall provide such supporting evidence of compliance as JEANNEAU may reasonably request.

5.     The DEALER shall ensure that all of its suppliers, agents and subcontractors who perform services or provide goods in connection with this Agreement ("Associated Persons") do so only on the basis of a written contract which imposes on and secures from such Persons terms equivalent to those imposed on the DEALER in this <u>Article XXVII</u> ("Relevant Terms"). The DEALER shall be responsible for the observance and performance by such Persons of any of the Relevant Terms.

6.     Breach of this <u>Article XXVII</u> shall be deemed and shall constitute a material breach by the DEALER of this Agreement under <u>Article XX.1(a)</u>.

## ARTICLE XXVIII: ENTIRE AGREEMENT

This Agreement constitutes the entire agreement of the parties with respect to the subject matter hereof, and all other prior or contemporaneous agreement of the parties with respect to said subject matter are hereby merged into and superseded by this Agreement.  This Agreement may not be changed modified or amended other than by a further written agreement signed by both parties hereto.

27

CHARLESTON 990019

CYC 002968

## ARTICLE XXIX: NON-ASSIGNABILITY BY DEALER

This Agreement shall be binding upon and shall inure to the benefit of the respective successors and assigns of the parties hereto; provided, however, that the DEALER shall not assign, transfer, pledge or mortgage this Agreement or any portion of this Agreement to any person or party whatsoever without the prior written consent of JEANNEAU. Any purported succession not having the prior written approval of JEANNEAU shall be null and void, and shall constitute a default hereunder.

## ARTICLE XXX: SEVERABILITY

In the event that one or more terms and conditions of this Agreement shall at any time be found to be invalid or otherwise rendered unenforceable, such terms and conditions shall be severable from this Agreement so that the validity and enforceability of the remaining terms and conditions of this Agreement shall not be affected thereby.

## ARTICLE XXXI: EXHIBITS

The exhibits and appendices to this Agreement are incorporated herein by reference and made a part of this Agreement.

## ARTICLE XXXII: COUNTERPARTS

Provided that all parties hereto execute a copy of this Agreement, this Agreement may be executed in counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument. Executed copies of this Agreement may be delivered by facsimile transmission, in PDF format, or other comparable means. This Agreement shall be deemed fully executed and entered into on the date of execution by the last signatory required hereby.

## ARTICLE XXXIII: STATE-SPECIFIC PROVISIONS

To the extent the laws of any jurisdiction in which the DEALER is located require the laws of its jurisdiction to govern certain aspects of the contractual relationship between the parties, such laws are deemed to be incorporated herein by reference and shall be deemed to amend any conflicting provisions of this Agreement to the fullest extent permitted by law, such that this Agreement is a legally valid and binding contract under such applicable law. To the extent applicable and required by law, the state-specific required provisions and amendments to this Agreement are attached hereto as Appendix 12 and incorporated herein by reference with respect to such state.

28

CYC 002969

IN WITNESS WHEREOF, the parties hereto have executed this Agreement, each by its duly authorized officer all as of the day and year first above written.

CHESAPEAKE YACHT CENTER  INC

By: _____

Title: _Member / Partner_____

Witness: _____

Print Witness Name: _Jessica T. Knott_____

JEANNEAU AMERICA, INC.

By: _____

Title: _President_____

29

CYC 002970

## APPENDIX 1

List of Boats

The DEALER will have the right to purchase all models of PRESTIGE that are currently in production and that are published on the PRESTIGE price list appearing on PRESTIGE's dealer web site at pro.prestige.com

CHARLESTON 339609v9

CYC 002971

## **APPENDIX 2**

Zone of Principal Responsibility

The DEALER'S Zone of Principal Responsibility is defined by the following geographic territory(ies):

Certain areas of the United States, in the states of MARYLAND, DELAWARE, PLUS THE AREA OF THE DISTRICT OF COLUMBIA, KNOWN AS WASHINGTON DC AND VIRGINIA

as those areas are delineated and defined on the PRESTIGE "Dealer Zip Codes Map" found on the PRESTIGE dealer web site.



CHARLESTON 339603v9

## APPENDIX 3

Secondary Network

The DEALER has not been approved for the establishment of any Secondary Network.

CHARLESTON 3390859

CYC 002973

## APPENDIX 4

### 4-1: Annual promotional plan

The DEALER will accomplish a specific promotional plan within the first Contractual Period, which will be specifically defined and presented to JEANNEAU, for its explicit approval, prior to the signing of this Agreement, and then DEALER will present to JEANNEAU, for its explicit approval, a specific promotional plan 30 days or more prior to the start of each subsequent Contractual Period.

### 4-2: Boats exhibited

The DEALER agrees to have on order for stock or have in stock at all times during the term of this Agreement a mix of 3 number models of boats worth an average of at least ███████████ at wholesale, and the DEALER agrees to have a dedicated JEANNEAU floorplan or wholesale stocking financing capability of at least ████████ DEALER AGREES that failure to comply with either requirement for stock or dedicated floorplan financing is valid grounds for termination of this Agreement.

CYC 002974

## APPENDIX 5

Terms and conditions in relation to the transfer and use of personal data

DEALER agrees to provide JEANNEAU with the names and personal data of prospects for JEANNEAU BOATS and customers owning JEANNEAU BOATS, for purposes of promotion and service by JEANNEAU.

CHARLESTON 339603v9

CYC 002975

## APPENDIX 6

Warranty Terms and Conditions of the Boats

DEALER agrees that the only Warranty applicable to the Boats is the **Jeanneau America, Inc. Limited Warranty – For Boats Manufactured After September 1, 2012, a copy of which is attached hereto.**

CHARLESTON 339603v9

CYC 002976

Jeanneau America, Inc. Limited Warranty – For Boats Manufactured After 1 September 2012
Page 1 of 2

Jeanneau America, Inc. of Annapolis, Maryland ("Jeanneau") warrants to the original purchaser or any subsequent owner ("Owner") during the time of this limited warranty ("Limited Warranty"), that a boat, FOR WHICH A VALID WARRANTY HAS BEEN SIGNED BY THE ORIGINAL PURCHASER, AND REGISTERED WITH AND RECEIVED BY JEANNEAU, excluding parts or accessories not manufactured by Jeanneau or by any affiliates of Groupe Beneteau of St. Hilaire, France, will be free from defects in material and workmanship for a period equal to _the earliest of:_ (i) two years from the date of the delivery to the original purchaser, or (ii) three years of the end of the model year of the boat (normally August 1 of each year), or (iii) two years of first utilization of the boat by a dealer or other person for demonstration purposes or other in service use. This limited warranty shall be valid ONLY IF the mandatory periodic inspections and check lists required by Jeanneau (at original commissioning, at 100 hours of use and at twelve months after original commissioning) have been accomplished and registered by an authorized Jeanneau dealer or by a service provider approved in writing by Jeanneau.

In addition, Jeanneau warrants to the Owner, except for prototypes, that the hull and deck structure of the boat will be free from _structural defects_ in material and workmanship for a period of five (5) years from _the earliest of:_ (i) the date of delivery of the boat to the original purchaser, or (ii) the end of the model year of the boat (normally August 1 of each year), or (iii) the first utilization of the boat by a dealer or any other person for demonstration purposes or other in service use. Jeanneau's obligation under this Limited Warranty shall be limited to the repairing or replacing (or causing to be repaired or replaced), at Jeanneau's option, the part or parts which are recognized defective by it in material or workmanship within the applicable warranty period to the exclusion of all other remedies.

Jeanneau, per the conditions of this paragraph, will repair below water gelcoat surfaces of the hull that have abnormal blisters which occurred as a result of defects in material and/or workmanship within five (5) years of date of delivery to the original purchaser. *This portion of the warranty does not extend to the rudder or keel.* Payment or credit will be issued based upon the following prorated schedule per a date relative to the end of the model year of the boat (normally August 1), provided that the original factory gelcoat has not been altered in any manner that would void the warranty (*i.e.,* aggressive gelcoat sanding or unauthorized repairs): (i) Less than twenty-four (24) months of the end of the model year: 100%; (ii) twenty-five (25) to thirty-six (36) months of the end of the model year: 50%; and (iii) thirty-seven(37) to sixty (60) months of the end of the model year: 25%. Jeanneau requires that the method and the cost of the repair be approved prior to the commencement of any repairs. Jeanneau reserves the right to refuse or alter any claim in whole or in part that it deems not within the normal industry standard.

One can and should expect some minor cracking of the gelcoat after a period of time, which is common in the marine industry, and such minor cracks are not a structural concern. This warranty does not extend to any losses due to misuse, accident, disaster, abuse, neglect, normal wear and tear or improper maintenance and use, including aggressive sanding of the gelcoat. Jeanneau will repair any gelcoat surface of the hull or deck that has abnormal cracks which occurred only as a result of defects in material and/or workmanship within two (2) years from the date of the end of the model year of the boat (normally August 1). Jeanneau requires that the method and cost of repair be approved prior to the commencement of any warranty repairs.

Repairs under this Limited Warranty do not result in a renewal or extension of the original warranty for the boat or a part thereof. Jeanneau reserves the right to require that the Owner must have the boat delivered to an authorized dealer or authorized repair facility located within continental North America, prior to the commencement of any warranty repair. All transportation charges, storage charges and duties shall be borne by the Owner. Jeanneau requires proof of purchase of the boat on which an Owner is seeking warranty repairs. Failure to notify Jeanneau of a warranty claim in writing prior to the end of the applicable warranty period provided herein shall constitute a waiver of any such claim.

This Limited Warranty does not extend to: (1) any losses due to misuse, accident, disaster, abuse, neglect, normal wear and tear or improper maintenance or use, including aggressively sanding the gelcoat; (2) boats or any part thereof which have been repaired or altered without Jeanneau's prior written approval; (3) accessories or parts not supplied by Jeanneau or Groupe Beneteau, or parts or accessories installed during the process of manufacturing that were not manufactured by Jeanneau or Groupe Beneteau, for which the only warranty will be the one, if any, provided by the supplier of the part or accessory; (4) damages resulting from any modification made to the boat; (5) boats for rental, lease, or charter; (6) antifouling, varnishes,

CYC 002977

Jeanneau America, Inc. Limited Warranty – As of 1 September 2012
Page 2 of 2

paints, acrylon, naugahyde, fabrics, headliners, chrome, anodized coatings, keel coatings, sails, cushions, or running rigging, as these items are subject to deterioration caused by climate, corrosion, normal use conditions, or wear and tear; (7) reasonable and necessary maintenance, including, but not limited to, periodic rebedding of chain plates, stanchion bases, windows and/or window frames, and winches; (8) damages or deterioration due to the non-observance of maintenance recommendations as described in the owner's manual or non-compliance with the normal rules of boat maintenance; (9) failure to take reasonable measures necessary to protect the boat; (10) any damage or deterioration to the boat resulting from participation in a competitive sporting event. In addition, if (a) any structural damage to the boat is suffered as a result of any cause other than a defect in material or workmanship (whether or not such damage requires or results in any repairs to the hull or deck), or (b) any repairs or alterations to the boat of any nature whatsoever are made by any person or entity not approved to do so in writing by JEANNEAU, prior to such repairs, then the five-year hull/deck warranty set forth above will immediately thereupon terminate and be of no further force or effect.

THIS LIMITED WARRANTY IS EXPRESSLY IN LIEU OF ALL OTHER WARRANTIES EXCEPT THOSE ENUMERATED HEREIN. THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE, AND THE IMPLIED CONDITIONS OF MERCHANTABLE QUALITY AND FITNESS FOR A PARTICULAR PURPOSE, ARE HEREBY LIMITED TO THE APPLICABLE WARRANTY PERIODS SET FORTH HEREIN. JEANNEAU AND GROUPE BENETEAU HEREBY DISCLAIM ALL OTHER LIABILITIES OF WHATEVER NATURE TO THE EXTENT ALLOWED BY APPLICABLE LAW, AND NEITHER JEANNEAU NOR GROUPE BENETEAU ASSUMES, NOR AUTHORIZES ANY PERSON, INCLUDING, BUT NOT LIMITED TO, THE DEALER, TO ASSUME FOR IT, ANY OTHER OBLIGATION OR LIABILITY IN CONNECTION WITH THE SALE AND USE OF JEANNEAU BOATS.
JEANNEAU AND GROUPE BENETEAU SHALL IN NO EVENT, TO THE EXTENT PERMITTED BY APPLICABLE LAW, BE LIABLE TO THE OWNER OR ANY OTHER PERSON OR ENTITY FOR DAMAGES OF ANY KIND, INCLUDING BUT NOT LIMITED TO DIRECT, INDIRECT, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES (AS TO ALL CONSEQUENTIAL DAMAGES EXCEPT THOSE ARISING FROM PERSONAL INJURY), ARISING FROM THE SALE OR IN CONNECTION WITH THE USE OR INABILITY TO USE THE BOAT FOR ANY PURPOSE WHATSOEVER, IRRESPECTIVE OF WHETHER THE CLAIMS OR ACTIONS FOR SUCH DAMAGES ARE BASED UPON CONTRACT, TORT, NEGLIGENCE, STRICT LIABILITY, WARRANTY, OR OTHER LEGAL THEORIES OF LIABILITY.

For the purposes of compliance with the Federal Boat Safety Act of 1971, regulations promulgated thereunder, and all notification procedures set forth therein, Jeanneau requires that the purchaser complete the information requested below concerning your current address and contact information, which shall be returned to Jeanneau by your Dealer.

*Jeanneau reserves the right, at any time, to make changes in the specifications, design of, or make additions, substitutions or improvements to, the boats without prior notice or obligation to incorporate such change, addition, or improvement in any boat manufactured prior thereto.*

This Limited Warranty gives you specified legal rights. However, you may also have other rights, which may vary from state to state or jurisdiction.

I hereby acknowledge that this Jeanneau America, Inc. Limited Warranty was available for my/our review prior to purchase of the boat; that is was attached to Dealer's purchase order in its entirety at the time that I purchased my boat from said Dealer; that I have read and understood such Limited Warranty in its entirety; and that I have a copy of such Limited Warranty, as attached to Dealer's purchase order, for future reference.

| | | |
|---|---|---|
| Signature of Owner | Date | Boat Model & Official Hull # |
| Owner's Name/Please Print Clearly | Dealer | Commissioning Date (Tentative) |
| Mailing Address of Purchaser | E-mail address | |
| City, State, Zip | Preferred Contact Phone Number of Owner | |

CHARLESTON 339605v9

CYC 002978

## APPENDIX 7

### Net tariff and deposits

The DEALER will pay a net price for **powerboats** calculated upon the following
discounts of ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ the base boat price for
powerboats a ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ off the option prices as
appears on the suggested retail price list as is published on the PRESTIGE price list
appearing on PRESTIGE's dealer web site. By way of exception, JEANNEAU
reserves the right to at times charge a net price on certain options and may modify the
base boat discounts by way of prior notice to the DEALER.

**NB: any taxes due, transportation charges or custom items are the responsibility
of the DEALER.**

DEPOSITS:

The DEALER will pay, and will be obligated to pay, a deposit for each Boat ordered
during the first Contractual Period, and unless modified by notice for subsequent
Contractual Periods, the amount defined below. If the order is entered and confirmed
by JEANNEAU, and subsequently the DEALER cancels the order without
JEANNEAU'S approval, the deposit will be retained by JEANNEAU as liquidated
damages.

**Deposit Amounts will be those listed on the PRESTIGE dealer web site.**

CYC 002979

**APPENDIX 8**

General terms and conditions for the sale of Spare Parts

The DEALER will prepay via credit card for all spare parts and for all shipment costs of items ordered from JEANNEAU, and the DEALER will use the online ordering system with the understanding that all parts orders are custom orders that are not returnable, unless specifically agreed to by JEANNEAU.  The DEALER also acknowledges that Spare Parts, are not warranted by JEANNEAU, though some parts may have the benefit of another warranty supplied by the original manufacturer of the part.

AS BETWEEN THE DEALER AND JEANNEAU, JEANNEAU DISCLAIMS THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE, AND THE IMPLIED CONDITIONS OF MERCHANTABLE QUALITY AND FITNESS FOR A PARTICULAR PURPOSE.

## APPENDIX 9

Quota, Negotiated Objective and End-of-Year Discounts

The DEALER shall, during each Contractual Period, purchase Boats for which total payments satisfy the Quota established by JEANNEAU, which shall equal sixty percent ▉▉▉ of the Negotiated Objective for such Contractual Period. In the first contractual period, DEALER agrees upon reaching an annual Quota of ▉▉▉▉▉ (which is ▉▉▉ of the annual Negotiated Objective of ▉▉▉▉▉ of purchases of the net base boat price of PRESTIGE boats, not including options. Quota goals and the Negotiated Objective for the next subsequent contractual period will be assigned 30 days prior to the start of the next contractual period.

CHARLESTON 3986Hv9

CYC 002981

## APPENDIX 10

Key Personnel

For the purposes of this contract the Key Personnel related to the DEALER for which JEANNEAU reserves the right to rescind this contract are:

Josh White
Ryan Dobb

CYC 002982

## APPENDIX 11

Relevant Policies

JEANNEAU may periodically announce sales, price, conditions and service policies or information which will be announced and published on the PRESTIGE dealer web site (pro.prestige.com), and the DEALER agrees to research, observe, abide by and follow these policies in the course of their representation and promotion of the PRESTIGE boats.

CYC 002983

**APPENDIX 12**

State Specific Provisions

[NONE]

CHARLESTON 339603v9

CYC 002984

## APPENDIX 13- SALE OF COMPETITOR GOODS.

The DEALER shall not sell, or arrange for the sale of, either directly or indirectly, any goods in competition with the Products, unless approved in writing by JEANNEAU. JEANNEAU **CONFIDENTIALLY** acknowledges and accepts that, subject to annual review, the DEALER may promote and sell the following brands of boats in addition to those that the DEALER promotes and sells which are PRESTIGE boats:

Date 5/24/2016

Acknowledged and accepted by Nicolas HARVEY, President of JEANNEAU America, Inc.

CHARLESTON 339603v9

CYC 002985

## APPENDIX 14

Specific Provincial Provision

[NONE- but special mention regarding Article XXIV is made below as a convenience]

### ARTICLE XXIV:  LANGUAGE OF THE CONTRACT

This Agreement is in the English language only, which language shall be controlling in all respects, and any versions or explanations of this Agreement in any other language shall be for accommodation only and shall not be binding on the parties to this Agreement. All communications and notices made or given pursuant to this Agreement, and all documentation and support to be provided, unless otherwise noted, shall be in the English language.

**Solely As a Convenience,** below is a rough translation of Article XXIV

### ARTICLE XXIV: LANGUE DU CONTRAT

*Le présent Accord est en anglais seulement, quelle langue doit être le contrôle à tous les égards, et toutes les versions ou les explications du présent Accord dans une autre langue doit être un logement et ne doivent pas être obligatoires pour les parties au présent accord. Toutes les communications et notifications faite ou donnée en vertu du présent Accord, ainsi que toute la documentation et le soutien à fournir, sauf indication contraire, sont en langue anglaise.*

CYC 002988